IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLINTON SPELLMAN, et al., | : | CIVIL ACTION |
| *On Behalf of Themselves and All Others* | : | |
| *Similarly Situated* | : | No. 10-1764 |
| | : | |
| v. | : | |
| | : | |
| AMERICAN EAGLE EXPRESS, INC., | : | |
| *Doing Business as AEXGROUP* | : | |

FILED

MAR 1 4 2013

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                   **March 14, 2013**

In this putative Fair Labor Standards Act (FLSA) collective action, a group of delivery drivers for Defendant American Eagle Express, Inc. (AEX) allege AEX misclassified them as independent contractors rather than employees, resulting in their being denied overtime compensation in violation of the FLSA, 29 U.S.C. § 207(a).[1] In May 2011, this Court conditionally certified a collective class of all former and current AEX delivery drivers who may be owed unpaid overtime wages and whose claims for such wages are not barred by the three-year statute of limitations. Notice regarding this lawsuit was sent to potential collective plaintiffs, and 193 individuals opted to join the proposed collective class (the "opt-in Plaintiffs"), for a total of 201 class members. After the close of discovery, AEX filed a motion to decertify the collective class. For the reasons set forth below, AEX's motion to decertify will be granted.

**FACTS**[2]

---

[1] The Plaintiffs who filed this suit include Clinton Spellman, John Ziglar, Owen Thurman, Jean Dende, Sunday Chimezie, Elmuthana Bachir, Jeffrey Griffin, and William Hammond (collectively, "Plaintiffs"). Two additional named Plaintiffs were dismissed pursuant to a stipulation.

[2] The following facts are taken from the parties' and witnesses' deposition testimony and declarations, as well as from interrogatories and documents in the record.

AEX is a courier company in the business of delivering financial and medical products to banking institutions, hospitals, and pharmacies. AEX contracts with several hundred drivers to make its scheduled pick-ups and deliveries. Since May 2008, all AEX drivers have been required to sign a form contract, the Transportation Brokerage Agreement (TBA), which classifies each driver as an independent contractor. Drivers must supply their own vehicles, cellular phones, cargo scanning devices, and vehicle insurance. Some members of the proposed collective class used vehicles they already owned, while others purchased vehicles to use expressly for cargo delivery, including vehicles bought specifically to meet the requirements for delivering to AEX's pharmaceutical customers. Some drivers also purchased hand trucks and special locks to use in providing services for AEX. A few collective class members testified they claim income tax deductions for home offices and vehicle depreciation based on their work with AEX.

AEX subjects its drivers to several entrance and performance requirements. All drivers must undergo criminal background checks and drug screenings. Any helpers or passengers must also pass some form of screening. AEX mandates all delivery vehicles be inspected before they are permitted to carry cargo; however, at least one opt-in Plaintiff testified AEX never inspected his vehicle.[3]

AEX also imposes on its drivers several requirements necessary for monitoring their progress. AEX provides drivers with a daily "route manifest" listing each delivery and the approximate time when it should be delivered. At each stop, drivers must scan the delivered package using the scanning device to show it was delivered. AEX monitors these scans to track

---

[3] The complete details of every proposed collective class member's relationship with AEX are unknown at this time. Of the 201 members of the collective class, 108 have not responded to written discovery, and of the 39 opt-in Plaintiffs whose depositions were noticed, only 8 were deposed.

the packages and drivers. Drivers are also asked to call AEX dispatchers hourly, although several class members admitted there were no repercussions for failing to call in. Although some members of the collective class described AEX as requiring deliveries to be made in the order they are listed in the manifest, others admitted drivers can rearrange the order of their deliveries for their own convenience so long as the deliveries are not late. Two opt-in Plaintiffs stated they were given specific start times by AEX, but others explained there was no required time to arrive at AEX's facilities. Plaintiffs allege AEX prohibits unauthorized stops, but several drivers testified they regularly made stops without authorization from AEX and were not disciplined. Several drivers testified AEX requires its drivers to be properly groomed and wear apparel with AEX's logo. Other collective class members, however, stated an AEX badge was all that was required or admitted they, at times, did not wear any AEX logo without repercussions. Still other class members gave conflicting descriptions of the dress code for drivers. As for the types of vehicles used, AEX purportedly markets itself as requiring its drivers to use only vehicles less than five years old. But several collective class members testified they used vehicles much more than five years old.

AEX conducts unannounced "field audits," during which an AEX employee inspects a driver during his or her route to check for compliance with such standards as maintaining proper identification, ensuring the vehicle and its contents are secure, refraining from unauthorized stops, operating the vehicle safely, carrying a cellular phone, and using the same vehicle on file with AEX. A substantial portion of the collective class, however, was never subjected to any such audit.

Some collective class members testified they could not refuse deliveries assigned to them by AEX. Several Plaintiffs and opt-in Plaintiffs testified, however, they could reject

assignments, and many admitted they refused to continue servicing routes they felt were not optimizing their compensation. Others admitted they refused other work requests from AEX such as loading cargo and training new drivers. Several class members also testified they could negotiate compensation for a route and seek new routes if they were not pleased with the compensation of their current route, although many others testified they never negotiated their compensation with AEX.

A majority of the proposed collective class members contracted with AEX directly and provided delivery services to AEX exclusively. Twenty-eight opt-in Plaintiffs, however, incorporated their own cargo delivery businesses and entered into the TBA through those businesses. Several printed their business names on their vehicles to advertise their services. Some also performed work for other courier services besides AEX. At least one opt-in Plaintiff provided services to AEX as an employee of an incorporated business entity in which she owned no stake. The business entity, rather than the opt-in Plaintiff, entered into the TBA and provided the opt-in Plaintiff the delivery vehicle and other necessary tools for the job. AEX compensated the company, which in turn paid her as its employee.

The duration of the relationship between driver and AEX varies dramatically across the proposed collective class, with many class members having performed services for AEX for several years and some having only been engaged for several days. At least one class member stated he could cease performing delivery services for AEX for an extended period of time and then resume deliveries by simply informing AEX he wished to do so.

**DISCUSSION**

The FLSA requires employers to pay overtime compensation for an employee's work in excess of 40 hours per week. 29 U.S.C. § 207. The statute also permits "similarly situated"

employees to sue collectively for violations of this provision. *Id.* § 216(b). Members of such collective actions must affirmatively opt in to the case. *Id.* Certifying an FLSA collective action is a two-stage process. At the initial phase, the court makes a preliminary determination whether the named plaintiff has made a "modest factual showing" that members of the proposed collective class are similarly situated. *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011). If the plaintiff makes such a showing, the court "conditionally certifies" the collective class for the purposes of notice and pretrial discovery. After discovery, the court must make a final certification decision based on the fully developed record. At this stage, the plaintiff has the burden of establishing by a preponderance of the evidence that he and the opt-in plaintiffs are similarly situated. *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012).

In deciding whether plaintiffs are similarly situated, courts must make a case-by-case determination based on all relevant factors, including "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Id.* at 536-37. "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." *Id.* at 537. In addition, courts consider whether collective treatment will achieve the primary objectives of a § 216(b) collective action: "(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).

Here, Plaintiffs have failed to show the proposed collective class members are similarly situated. Rather, the record shows the class members are particularly dissimilar with respect to the individual circumstances of their employment. Moreover, because the test for determining whether a worker is an employee or an independent contractor under the FLSA requires an individualized examination of the worker's actual relationship with the alleged employer, the varying employment circumstances of the collective class members create individual defenses and make this case unsuitable for collective treatment.

Courts determining whether a worker is an employee or an independent contractor for purposes of the FLSA look to the "economic realities" of the relationship between the alleged employer and employee. *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991). In ascertaining the nature of the relationship, the following factors should be considered:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; [and] 6) whether the service rendered is an integral part of the alleged employer's business.

*Id.* (quotation omitted). "Not only should courts examine the 'circumstances of the whole activity,' they should 'consider whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service.'" *Id.* (quoting *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985)).

Plaintiffs have shown all collective class members have signed the TBA and that AEX subjects its drivers to certain policies controlling some aspects of how drivers perform their work. Many of these standards, however, are not applied with any consistency to the members of the proposed collective class. For instance, while Plaintiffs argue AEX forbids its drivers

6

from deviating from the route manifests and specified delivery times, several drivers testified that for some customers, the delivery sequence and times are merely suggestions and that drivers can decide how best to sequence deliveries. Plaintiffs argue AEX subjects all its drivers to random field audits to enforce a number of performance requirements, such as not making unauthorized stops, carrying proper identification, and using the same vehicle on file with AEX. A significant portion of the collective class has never been audited, however, and several drivers testified they made stops without authorization from AEX for personal reasons without repercussions. Plaintiffs also point to an AEX document purporting to reflect a policy that all delivery vehicles must be less than five years old and undergo inspection by AEX, but many collective class members used vehicles more than five years old and some members' vehicles were never inspected by AEX. Similarly, while many class members stated they were required to wear clothing displaying AEX's name, several of them admitted neither they nor other drivers they witnessed were disciplined for neglecting to wear AEX apparel. Others provided a different description of AEX's driver appearance requirements altogether.

Thus, to the extent Plaintiffs argue these "policies" reflect AEX's control over its drivers, Plaintiffs have failed to show the collective class members are similarly situated with respect to how such policies were actually enforced. Under the FLSA, an alleged employer's degree of control over its alleged employees is determined by examining the employer's *actual* control, not its *right* to control. *See Dole v. Snell*, 875 F.2d 802, 808 (10th Cir. 1989) ("[I]t is not what the [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive." (quoting *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987))); *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1371 (9th Cir. 1981) (explaining economic reality inquiry requires that "in evaluating control, the test is not what the agent could

do but what in fact the agent does do"). A determination of the economic realities of AEX's control over its drivers, therefore, would require individualized examinations of every class member. The fact that all drivers sign the same TBA does not help Plaintiffs' cause, as "[e]conomic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA." *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 755 (9th Cir. 1979). Additional descriptions by proposed class members of the relationship between AEX and its drivers further demonstrate the need for individualized examinations of AEX's control. As just one example, the testimony of collective class members varies greatly regarding the ability of drivers to refuse certain routes without negative repercussions. *See, e.g., Gate Guard Servs. L.P. v. Solis*, No. V-10-91, 2013 WL 593418, at *4 (S.D. Tex. Feb. 13, 2013) (noting ability to reject assignments without penalty is relevant to the "control" factor in FLSA economic realities test, and citing cases).

Another way in which the proposed collective class members are not similarly situated with respect to their claim is their "opportunity for profit or loss depending upon [their] managerial skill." *Martin*, 949 F.2d at 1293. Most significantly, while a majority of the proposed collective class members presumably signed the TBA on their own behalf and performed delivery services only for AEX, a substantial minority provided their services to AEX through an incorporated business entity. Many of these drivers also provided cargo delivery services through such entities to other businesses at the same time they delivered cargo for AEX. Some also advertised their separate corporations on their vehicles in order to develop more business. This kind of entrepreneurial conduct strongly suggests an independent contractor relationship, while the absence of such activity is indicative of employment. *See FedEx Home Delivery v. NLRB*, 563 F.3d 492, 499 (D.C. Cir. 2009) (observing delivery drivers' ability to

incorporate and provide delivery services for multiple companies shows entrepreneurial opportunity for gain or loss indicative of independent contractor status). Yet a third category of AEX driver includes at least one opt-in Plaintiff who never contracted with AEX, but was employed by a company who had entered into the TBA. This disparity in "employment" circumstances makes it impossible to determine whether members of the collective class as a whole are, as a matter of economic reality, dependent upon AEX for the opportunity to provide their services. *See Martin*, 949 F.2d at 1293; *see also Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves."); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1538 (7th Cir. 1987) (explaining the degree of economic dependence on the alleged employer is the focus of all other factors in the economic realities test); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976) (same).

Upon considering the remaining factors of the economic realities test, several other disparities among the proposed collective class members demonstrate the impracticality of attempting to examine the economic reality of AEX's relationship to its drivers through representative or common evidence. For example, as to the class members' investment in equipment, almost all had to invest in a vehicle, cell phone, cargo scanner, and accident insurance, but some simply used cars they already owned, while others purchased cargo vans to be eligible to perform a broader range of deliveries. Many purchased other tools such hand trucks and locks, while others did not. Only some invested in home offices for which they claimed income tax deductions. In stark contrast, the opt-in Plaintiff employed by a third party invested nothing to perform services for AEX. The "investment" factor, therefore, may weigh in

favor of or against employment status, depending on the particular class member. Similarly, while some class members demonstrate the exclusivity, continuity, and permanence indicative of an employment relationship, *see Martin*, 949 F.2d at 1296, several performed delivery and other services for other companies, and other class members worked for AEX for only a number of weeks or even days. At least one driver testified he ceased running his route for AEX for an extended period of time only to start again by simply letting AEX know he wished to resume his services.

The factual disparities among the proposed collective class members highlighted above are far from exhaustive, yet based on these differences alone the class members are not similarly situated for purposes of § 216(b). AEX has an individualized defense as to each member of the class based on the economic realities of his or her dependence on AEX. *See Zavala*, 691 F.3d at 537 (noting presence of individualized defenses can render a collective class not similarly situated). Hence, resolving the collective class's claims would require an individual examination of each driver's relationship with AEX, and collective treatment would not satisfy the objectives of § 216(b) of reducing costs and increasing efficiency. *See Sperling*, 493 U.S. at 170 (discussing objectives of collective actions); *see also In re FedEx Ground Package Sys., Inc.*, 662 F. Supp. 2d 1069, 1083 (N.D. Ind. 2009) (denying § 216(b) certification because FedEx drivers' independent contractor misclassification claims would require "an individualized examination of the multiple factors relating to each drivers' employment"). Plaintiffs have not met their burden of showing the proposed collective class members are similarly situated; therefore, AEX's motion to decertify will be granted.

An appropriate Order follows.

BY THE COURT:

_____
Juan R. Sánchez, J.